Charles R. KUNKES and Marguerite
V. Kunkes, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–776L.

United States Court of Federal Claims.

Oct. 31, 1994.

Lindell R. Church, David W. Ansley, and Lynn C. Rodgers, Springfield, MO, for plaintiffs.

Marc A. Smith, with whom was Acting Asst. Atty. Gen. Lois J. Schiffer, Washington, DC, for defendant. Karen Hawbecker, Washington, DC, of counsel.

## OPINION

BRUGGINK, Judge.

This is a claim for a taking under the Fifth Amendment to the Constitution. The action, brought pursuant to the Tucker Act, 28 U.S.C. § 1491 (1988), is before the court on

the parties' cross motions for summary judgment. After considering the written and oral arguments, the court concludes that the defendant's motion should be granted and the plaintiffs' motion should be denied.

## BACKGROUND [1]

Under the Mining Act of 1872, 30 U.S.C. § 28–28(e) (1988) ("Mining Act"), mineral claims can be made on federal lands. The claims do not have to be patented to be valid, but they must reflect a discovery of minerals and meet other statutory requirements. Until more recently, the Mining Act required all claimholders to annually perform at least $100 worth of labor or make $100 worth of improvements on each claim in order to preserve an unpatented mining claim. 30 U.S.C. § 28. Failure to satisfy this affirmative obligation resulted in the claim being open to relocation. *Id.*

Additional requirements for claim preservation were imposed on claimholders by the Federal Land Policy and Management Act of 1976. 43 U.S.C. § 1701 *et seq.* (1988) ("FLPMA"). In order to preserve their property interest in unpatented mining claims, § 1744(a) required owners to file, prior to December 31 of every year after initial recording, a notice of intention to hold the claim, an affidavit stating that at least $100 worth of labor or improvements had been invested in each unpatented claim during the preceding assessment year, or a detailed reporting form. In addition, § 1744(b) required that all mining claims located prior to FLPMA's enactment be registered with the BLM by filing a copy of the official record of notice or certificate of location. In the event of noncompliance with these filing requirements, FLPMA provided that the claim would be conclusively deemed abandoned by the owner. 43 U.S.C. § 1744(c).

Sixteen years later, Congress once again changed the statutory requirements for preservation of unpatented mining claims by enacting the Department of the Interior and

1. The facts are drawn from plaintiffs' complaint and the parties' cross motions for summary judgment.

Related Agencies Appropriations Act for fiscal year 1993. Pub.L. No. 102–381, 106 Stat. 1374 (1992) ("Appropriations Act" or "Act"). This Act suspended the obligations specified in both the Mining Act and FLPMA for assessment years 1993 and 1994. In their place, it required claimants to pay an annual rental fee of $100 per claim, for each of these two years, on or before August 31, 1993. Pub.L. No. 102–381, 106 Stat. 1374, 1378.[2] *Id.* The Act further provided that a claimant's failure to make timely payment of this rental fee[3] would conclusively constitute abandonment of its claim.[4] Pub.L. No. 102–381, 106 Stat. 1374, 1379. The Act made exceptions for claimants holding ten or fewer claims. Such claimants remained subject only to the claim preservation requirements of the Mining Act and FLPMA. Pub.L. No. 102–381, 106 Stat. 1374, 1378–79.

Over a period beginning in 1969 and ending in 1991, the Kunkes accumulated approximately 575 contiguous mining claims in Mohave County, Arizona. For purposes of ruling on defendant's motion, the court assumes that the claims were valid prior to August 31, 1993. The plaintiffs attach to their motion for summary judgment two appraisals of the value of minerals on the claims. The minerals assessed are primarily gold and silver. A June 1994 appraisal exclusively of the Van Deeman mine places a gross value of the mineral reserves at $127,000,000. It estimates net, pre-tax income at approximately $59,000,000. Another appraisal of the balance of the minerals, dated May 1994, estimates a net value of $25,593,160. This appraisal recites that "the estimated potential net value clearly justifies expenditures for exploration and delineation of reserves."

Plaintiffs complied with the annual filing requirements imposed by FLPMA for each assessment year up to and including 1992.[5] For fiscal years 1993 and 1994, however, the Appropriations Act required plaintiffs to pay the aforementioned rental fee for each of their unpatented claims. P.L. 102–381, 106 Stat. 1374, 1378. The total fee on plaintiffs' claims under this Act was $115,000. As a result of their failure to pay, plaintiffs' claims were deemed abandoned.

## THE PARTIES' CONTENTIONS

Plaintiffs allege that they were financially unable to pay the fees required by the Ap-

---

2. [N]otwithstanding any other provision of law and effective upon the date of enactment of this Act, for fiscal year 1993, for each unpatented mining claim, mill or tunnel site on federally owned lands, in lieu of the assessment work requirements contained in the Mining Law of 1872, and the filing requirements contained in section 314(a) and (c) of the Federal Land Policy and Management Act of 1976, each claimant shall, except as provided otherwise by this Act, pay a claim rental fee of $100 to the Secretary of the Interior or his designee on or before August 31, 1993 in order for the claimant to hold such unpatented mining claim, mill or tunnel site for the assessment year ending at noon on September 1, 1993.... [F]or fiscal year 1994, for each unpatented mining claim, mill or tunnel site on federally owned lands, in lieu of the assessment work requirements contained in the Mining Law of 1872 and filing requirements of FLPMA, each claimant shall, except as provided otherwise by this Act, pay an annual claim rental fee of $100 per claim to the Secretary of the Interior or his designee on or before August 31, 1993 in order for the claimant to hold such unpatented mining claim, mill or tunnel site for the following assessment year beginning at noon on September 1....

Pub.L. No. 102–381, 106 Stat. 1374, 1378 (citations omitted).

3. The Act required claimholders to pay $200 for each of their unpatented mining claims ($100 for assessment year 1993 and $100 for assessment year 1994).

4. "[F]ailure to make the annual payment of the claim rental fee as required by this Act shall conclusively constitute an abandonment of the unpatented mining claim, mill or tunnel site by the claimant...." Pub.L. No. 102–381, 106 Stat. 1374, 1379. Despite this clear language, the Government submits that plaintiffs' mining claims still appear on BLM's active status list. BLM has not sent a voidance decision to plaintiffs regarding the status of these mining claims and has made no determination regarding their validity under the general mining laws. Consequently, the Government contends that plaintiffs' takings claim may not be ripe for adjudication. Because the court grants the Government's motion on other grounds, it is not necessary to address this contention.

5. In addition, plaintiffs allege that they complied with all of the requirements imposed by the Mining Act. Defendant has not challenged this allegation.

propriations Act.[6] They live on modest fixed incomes and have no significant assets other than the mining claims. The court accepts that they would be personally unable to pay the $115,000 in fees. Although they admit that Congress had the power to prescribe this type of fee, they argue that because the burden imposed by the Act was so unreasonably severe as to render it impossible for them to comply,[7] the result was a taking entitling them to just compensation under the Fifth Amendment. Plaintiffs contend that the Government deliberately set out to reacquire their claims for its own benefit and that Congress imposed the fee knowing that many owners would be unable to comply. They seek $575 million in damages.

The Government counters that no taking has occurred on these facts because the rental fee imposed by the Appropriations Act was a reasonable regulatory condition prescribed by Congress for the continued retention of unpatented mining claims. It emphasizes that the rental fee requirement placed substantially the same burden on plaintiffs as did the prior regulatory scheme under the Mining Act and FLPMA. In both cases, plaintiffs were required to expend $100 annually on each claim. The Government asserts that the fee obligation was a *de minimis* financial burden not rising to the level of a regulatory taking.

6. Whether or not plaintiffs were able to afford the payments required by the Appropriations Act is apparently not critical to their argument. Plaintiffs assert that the loss of their claims would still have constituted an unlawful taking, regardless of their financial ability to make the payments. As a result of the prior regulatory requirements under the Mining Act and FLPMA, plaintiffs argue that an expectancy was created whereby they could own and preserve unpatented mining claims by expenditure of their labor and efforts only. That expectancy was destroyed when defendant imposed the $100 rental fee requirement. Consequently, plaintiffs contend that this loss of expectancy would have resulted in an unconstitutional taking by the Government even if they had the necessary funds available but simply chose not to pay the fee.

7. To further demonstrate the severity of the burden imposed by the Appropriations Act, plaintiffs allege in their reply brief that information released by the Bureau of Land Management shows that, prior to August 31, 1993, there were over 1.1 million unpatented mining claims locat-

## DISCUSSION

■ There is no question that mining claims are "private property" enjoying the protection of the Fifth Amendment. *Freese v. United States*, 226 Ct.Cl. 252, 639 F.2d 754, 757 (1981). According to the court in *Oil Shale Corp. v. Morton*, 370 F.Supp. 108 (D.Colo.1973), "[a] mining claim is an interest in land which cannot be unreasonably or unfairly dissolved at the whim of the Interior Department. Once there is a valid discovery and proper location, ... [it] is 'real property in the highest sense.'" *Id.* at 124 (quoting *Forbes v. Gracey*, 94 U.S. 762, 767, 24 L.Ed. 313 (1876)). Although legal title to the land remains in the United States, the claimant enjoys a valid, equitable title in the claim, possessing all of the incidents of real property. *Oil Shale Corp.*, 370 F.Supp. at 124.[8] Accordingly, the Takings Clause limits the Government's ability to impose forfeitures on valid mining claims.

■ As far as the court is aware, the Supreme Court has not been asked to address a direct challenge to the constitutionality of the Mining Act's requirement that $100 worth of labor or improvements must be made on a claim annually. Presumably this is because its constitutionality is a foregone conclusion. If Congress creates a property right, it perforce has broad powers to limit

ed on public lands in the United States. Subsequent to the enactment of the Appropriations Act, however, in excess of 850,000 of these claims were lost by reason of nonpayment of the claim rental fee. This loss represented approximately seventy-five percent of the total claims outstanding. Plaintiffs argue that these data suggest that an entire class of claimholders was eliminated due to inability to pay, leaving only the small miners who were exempted from payment and the large mining companies. The original materials to support these allegations are not included in the motion papers. Nevertheless, for the purpose of ruling on defendant's motion for summary judgment, the court will assume those facts to be true.

8. Nevertheless, the Department of the Interior plays a significant role in the regulation of unpatented mining claims. Not only does the Department have plenary authority over the administration of all public mineral lands, it also has been given broad authority to issue regulations affecting these lands. *Hafen v. United States*, 30 Fed. Cl. 470, 473 (1994).

that right. Anyone accepting the property would of necessity take subject to those limitations. *See Van Sice v. Ibex Mining Co.,* 173 F. 895, 896 (8th Cir.1909). The question thus arises: Is an uncompensated forfeiture precipitated by the additional restrictions placed on existing claimholders by the Appropriations Act a violation of the Fifth Amendment?

■ The Supreme Court went a substantial distance towards answering that question in the negative in *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), a case involving the constitutionality of FLPMA. Before examining that case, however, it must be put in context by considering *Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), upon which the majority in *Locke* relied heavily. In *Texaco,* the Indiana Dormant Mineral Interest Act, Ind.Code §§ 32–5–11–1 through 32–5–11–8 (1976), provided that any severed mineral interest that remained unused for a period of twenty years would automatically lapse and revert to the current surface owner of the property, unless the mineral owner filed a statement of claim prior to the end of the twenty year period or within a two year grace period after the effective date of the statute. 454 U.S. at 518–19, 102 S.Ct. at 786. Texaco, whose unused mineral interests had lapsed upon expiration of the grace period under the Act, challenged the constitutionality of the Indiana statute, arguing that it effected a taking of property for public use without just compensation. *Id.* at 521–23, 102 S.Ct. at 788–89.

Holding that the Indiana Act did not effect an unconstitutional taking, the Court explained that "just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present inten-

tion to retain the interest." *Id.* at 526, 102 S.Ct. at 790.[9] In denying compensation to Texaco, the Court explained that it had never required the state to compensate the owner of an abandoned or lapsed private property interest for the consequences of his own neglect. *Id.* at 530, 102 S.Ct. at 792. The Court emphasized that it was Texaco's failure to make any use of the property that caused the lapse of the property right, not the action of the state. *Id.*

This approach was again used by the Court in *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). There, the Court addressed a regulatory takings challenge to § 1744 of FLPMA. Claimholders whose claims had been declared abandoned and void due to tardy filing[10] brought suit alleging that § 1744(c) effected an unconstitutional taking of their property without just compensation. *Id.* at 91, 105 S.Ct. at 1790.

Ultimately holding that the application of § 1744(c) did not constitute a taking by the United States Government, the Court reasoned that:

[e]ven with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties. As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties.

*Id.* at 104, 105 S.Ct. at 1797. In light of these principles, the Court concluded that "there can be no doubt that Congress could condition initial receipt of an unpatented mining claim upon an agreement to perform

---

**9.** The Court stressed that the state had not exercised its power in an arbitrary manner and that each of the actions required by the statute to avoid an abandonment of the mineral interest furthered a legitimate state goal. *Texaco,* 454 U.S. at 529, 102 S.Ct. at 792.

**10.** According to § 1744(a), a notice of intention to hold claim, an affidavit of assessment work performed on the claim, or a detailed reporting form must be filed with the BLM *"prior to* December 31." 43 U.S.C. § 1744(a) (emphasis added). The claimholders in this case, however, filed their paperwork *on* December 31. *Locke,* 471 U.S. at 89–91, 105 S.Ct. at 1789–91.

253

annual assessment work and make annual filings." *Id.* at 105, 105 S.Ct. at 1798.[11]

In reaching its decision, the Court emphasized that Congress' power to qualify existing property rights is particularly broad with regard to unpatented mining claims, because although owners hold fully recognized possessory interests in their claims, the United States remains the owner of the underlying fee title to the public domain upon which such claims are located. *Id.* at 104, 105 S.Ct. at 1797. As a result, the United States "maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired.... Claimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests." *Id.* at 104–05, 105 S.Ct. at 1798.

The Court made clear that "[r]egulation of property rights does not 'take' private property when an individual's reasonable, investment backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed." *Id.* at 107, 105 S.Ct. at 1799. Because the aggrieved claimants failed to inform themselves of the proper filing deadline and failed to timely file the documents required by federal law, the Court concluded that the property rights were extinguished by the claimants' untimely filing, not the action of Congress. *Id.*

■ The principle the court draws from these decisions is that Congress retains the affirmative power to change the conditions for continued ownership of mineral claims, assuming that power is reasonably exercised. This power inheres in the Government's underlying fee ownership and in Congress' general regulatory powers. The owners of claims thus hold their interests subject to possible forfeiture if they fail to comply with reasonable, new regulatory constraints. The

factors pointing to the reasonableness of the limitations in *Locke* and *Texaco* were the degree to which it was convenient to comply, the extent of adherence to principles of procedural due process, and whether there was a legitimate governmental interest involved. Application of the same considerations here compels a rejection of plaintiffs' claim.

The court recognizes that the present facts carry the issue beyond either *Locke* or *Texaco*. In those two cases, the Court could find fault in the claimants' failure to comply with the administrative requirements. Here, all of the Kunkes' claims were extinguished due to their failure to pay the filing fees. There was no neglect involved on their part because they were personally unable to pay the entire amount. While in theory the burden imposed by the Appropriations Act is no more severe than the burden originally imposed by the Mining Act, the material difference between the present circumstances and those that existed prior to the Appropriations Act is that claimants were no longer permitted to satisfy the $100 improvement per claim requirement by either providing in-kind labor themselves or through the value of exploration work done by others. Plaintiffs stress that under the Mining Act they were able to obtain third party assistance to satisfy the statutory requirements. Consequently, they did not have to expend $57,500 of their own labor or resources each year. The Appropriations Act raised the level of commitment by calling for a cash payment of $200 per claim prior to the August 1993 deadline.

Claimholders have always been subject to some ongoing proof of their interest in developing the mineral resources of their claims. Although the Appropriations Act raised the ante, it did so in a way that cannot be considered substantially different in kind or degree from what had previously been required. It was plainly motivated by the

---

**11.** The fact that these filing requirements were applied to vested claims (i.e., claims that existed prior to the enactment of FLPMA) was deemed insignificant by the Court because any retroactive application was found to be supported by "a legitimate legislative purpose furthered by rational means." *Locke,* 471 U.S. at 105, 105 S.Ct. at 1798 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709,

2717–18, 81 L.Ed.2d 601 (1984)). Of great import to the Court was that the statutory requirement for continued retention of mining claims imposed only a minor burden on claimants (i.e., filing a paper once a year indicating either an intention to hold the claim or "that the required assessment work had been performed"). *Locke,* 471 U.S. at 106, 105 S.Ct. at 1798.

same purpose, namely, elimination of stale or worthless claims. H.R.Rep. No. 626, 102nd Cong., 2d Sess. 14 (1992). The Supreme Court has held that this is a legitimate governmental interest. *Locke,* 471 U.S. at 105–06, 105 S.Ct. at 1798; *see also, Hickel v. Oil Shale Corp.,* 400 U.S. 48, 56, 91 S.Ct. 196, 201, 27 L.Ed.2d 193 (1970).

■ Nor can it be said that the fee requirement is unreasonable in its financial impact. What changed was the nature of the obligation—from $100 worth of labor or improvements to a $100 claim rental fee per year. In the years intervening between the Mining Act and the Appropriations Act, there had been no adjustment for the decline in the value of money. It would have been unreasonable to assume that Congress would forever ignore the depreciating value of the level of commitment that a claimant had to demonstrate. In addition, Congress made some effort to moderate the impact of the fee requirement by exempting holders of ten or fewer claims.

While the court accepts at face value that the Kunkes could not have paid the fees themselves, they themselves value the minerals encumbered by the 575 claims at over $80 million. It is unrealistic, in light of that circumstance, for the court to ignore other possibilities left open by the Appropriations Act. There is nothing in the Act, for example, that prohibits plaintiffs from obtaining third party funding to satisfy the rental fee requirements. They could have either borrowed on the value of the minerals or entered into a partnership with other investors contributing cash. The Kunkes also could have abandoned the least promising claims and paid fees on a smaller number, or they could have sold some of the claims and used the proceeds to pay fees on the balance. The court is forced to conclude that the Kunkes either unnecessarily chose to abandon valuable mineral interests or that the claims were not worth maintaining. This is plainly the choice that Congress envisioned forcing on claimholders. It was not unreasonable in doing so. A $100 fee is not unreasonable when compared to substantial mineral value. The $100 fee only becomes disproportionate

when compared to maintaining a worthless or marginal claim.

■ It is not an answer to compare the value of the claims against the cumulative cost of annual payments of a $100 fee per claim. As the Court taught in *Locke,* Congress has a legitimate interest in eradicating stale claims. If a piece of property has no economic value, then the pendency of a stale claim unnecessarily encumbers the property. A claim on a piece of property with no economically viable mineral interests is not in fact a valid claim. If, on the other hand, a piece of land does contain recoverable mineral interests of sufficient value to perfect a claim, then a $100 fee is inherently reasonable. It is certainly not confiscatory. As the Kunkes demonstrated by their appraisals, a relatively small amount of money can support claims of substantial size.

The present facts are totally unlike those of *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169 (Fed.Cir.1991), a case upon which plaintiffs rely. In *Whitney,* the Surface Mining Control and Reclamation Act [12] expressly prohibited the extraction of coal from a location the claimant had long believed it was entitled to mine. *Id.* at 1172–74. The purpose of the statute was to prohibit mining. The only way to comply was by not doing so. In the present case, the Appropriations Act itself did not prohibit any activity. Plaintiffs could have complied by paying the fee.

In *Whitney,* the trial and appellate courts found a reasonable, investment-backed expectation that mining could take place. *Id.* at 1174–75. Under the Appropriation Act, a claimholder's non-payment of a modest fee speaks volumes about the investment potential of a claim. It was not unreasonable for Congress to conclude that those claims not worth paying $100 per year to keep should be forfeited as worthless. As the Kunkes' appraisals make clear, development of mineral resources requires substantial investments of money. The potential return might be great, but so is the cost. Congress reasonably concluded that claimholders not willing

---

12. 30 U.S.C. §§ 1201 *et seq.* (1988).

to invest $100 per year for two years, or unable to get investment backing to that extent, do not have a reasonable, investment-backed expectations in their claims. Forfeiture of those claims does not require compensation.

Plaintiffs do not argue that the statute violates procedural due process or that they were excusably unaware of its requirements. There being no other ground for finding a taking, the court holds that the $100 claim rental fee imposed by the Appropriations Act was a reasonable regulatory restriction.

### CONCLUSION

Forfeiture of plaintiffs' claims due to their failure to pay the claim rental fees did not constitute a taking without just compensation. Plaintiffs' motion for summary judgment is therefore denied, and defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing the complaint. No costs.