PLAGER, Circuit Judge.
 

 This case arises under the Takings clause of the Fifth Amendment to the Constitution.
 
 [1]
 
 By legislation enacted in 1992, Congress required that in order to retain their unpatent-ed mining claims, claim holders must pay a per-claim annual fee of $100 for each of the years 1993 and 1994. This cash payment requirement replaced a prior requirement that the claim holders perform $100 worth of exploration and development work yearly on those claims. Appellants Charles and Marguerite Kunkes, who owned a number of these unpatented mining claims, failed to pay the amount required by the new legislation. Under the terms of the fee statute, nonpayment results in conclusive deemed abandonment of the claims and corresponding forfeiture to the Government. Appellants take the position that the new requirement has worked a taking of their property without just compensation in violation of the Fifth Amendment, and sued the United States for $575 million in compensation for their losses resulting from the forfeiture of the claims. The Court of Federal Claims held that forfeiture of appellants’ unpatented mining claims for failure to pay the statutory fee did not work a taking, and dismissed.
 
 [2]
 
 Appellants challenge that decision here. We affirm.
 

 BACKGROUND
 

 To encourage private development of mineral deposits, federal law permits private parties to discover, explore, and reclaim mineral deposits in federally-owned lands. 30 U.S.C. § 22 (1994) (“[A]ll valuable mineral deposits in lands belonging to the United States ... shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States ... under regulations prescribed by law.”);
 
 see also
 
 30
 
 *1551
 
 U.S.C. § 21a (1994).
 
 [3]
 
 The Mining Act of 1872, 30 U.S.C. § 26, provides that “[t]he locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, ... so long as they comply with the laws of the United States ... shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth....” 30 U.S.C. § 26.
 

 Thus federal law permits private parties to acquire exclusive possessory interests in federal land for mining purposes, interests which entitle claim holders to extract and sell minerals without paying royalties to the Government.
 
 See United States v. Locke,
 
 471 U.S. 84, 86, 105 S.Ct. 1785, 1788, 85 L.Ed.2d 64 (1985). Title to the underlying fee simple estate in the land remains in the United States. These possessory mineral interests are known as “unpatented” claims to distinguish them from the ownership interest of the private owner who has obtained a “patent,” that is, an official document issued by the United States attesting that fee title to the land is in the private owner.
 
 [4]
 

 See generally,
 
 Jan G. Laitos & Richard A. Westfall,
 
 Government Interference with Private Interests in Public Resources,
 
 11 Harv. Envtl. L. Rev. 1 (1987). Even though title to the fee estate remains in the United States, these unpatented mining claims are themselves property protected by the Fifth Amendment against uncompensated takings.
 
 See Best v. Humboldt Placer Mining Co.,
 
 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963);
 
 cf. Forbes v. Gracey,
 
 94 U.S. 762, 766, 24 L.Ed. 313 (1876).
 

 Under the Mining Act of 1872, unpatented mining claimholders could maintain ownership of their claims by performing $100 of assessment work or providing $100 of improvements for each claim during each year (referred to as the “assessment year”). An Act to Promote the Development of the Mining Resources of the United States, ch. 159, § 5, 17 Stat. 91, 92 (1872) (codified at 30 U.S.C. § 28). In 1976, Congress passed the Federal Land Policy and Management Act of 1976 (“FLPMA”), Pub.L. No. 94-579, 90 Stat. 2743 (codified at 43 U.S.C. §§ 1701-1782), which further required unpatented mining claimholders to file annually a notice of intention to hold the claim, an affidavit of the assessment work performed on the claim, or a BLM reporting form. 43 U.S.C. § 1744(a). Failure to comply with the filing requirement “shall be deemed conclusively to constitute an abandonment of the mining claim ... by the owner.” 43 U.S.C. § 1744(c).
 

 In 1992, Congress passed appropriations legislation for the Interior Department, which substituted a $100 per claim “maintenance fee” for the $100 of assessment work requirement, for the 1993 and 1994 assessment years. Department of the Interior and Related Agencies Appropriations Act, 1993, Pub.L. No. 102-381, 106 Stat. 1374, 1378 (1992) (“Appropriations Act”).
 
 [5]
 
 Claimhold-ers were required to pay the 1993 and 1994 maintenance fees by the end of the 1993 assessment year. Failure to pay the fee “shall conclusively constitute a forfeiture of the unpatented mining claim ... by the claimant and the claim shall be deemed null and void by operation of law.” 30 U.S.C. § 28i.
 

 Between 1969 and 1992, appellants located and filed 573 unpatented claims to minerals beneath public lands in Mohave County, Arizona. During that time, appellants provided affidavits attesting to their provision of $100 of assessment work per claim per year, and complied with all other requirements of the Mining Act and FLPMA. However, appellants did not pay the claim maintenance fee
 
 *1552
 
 for 1993 and 1994, which totalled roughly $115,000 for the 573 claims, asserting that they could not afford to do so. Accordingly, their claims were deemed abandoned.
 

 Appellants sued the Government in the Court of Federal Claims, asserting that the forfeiture of their claims constituted an uncompensated taking. The trial court granted summary judgment for the Government.
 
 Kunkes v. United States,
 
 32 Fed. Cl. 249 (1994). The trial court found that although unpatented mining claims are property rights protected by the Fifth Amendment, under the principles of
 
 Texaco, Inc. v. Short,
 
 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), and
 
 United States v. Locke,
 
 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), Congress may impose reasonable conditions on their retention without effecting a taking. 32 Fed. Cl. at 252-54. The trial court found that Congress had broad power in this regard, due in part to the fact that Congress created the rights at issue and, until patented to the claimant, the Government owns the fee title to the land on which the claims are located.
 
 Id.
 
 at 254. Further, the trial court found that claimholders had always been subject to some proof of interest in developing mineral resources, that the maintenance fee did not effect a substantial difference in the claimholders’ obligation, and that the fee was motivated by the legitimate governmental desire to eliminate stale or worthless claims as encumbrances on public lands.
 
 Id.
 
 at 255. The trial court concluded that a $100 fee, measured against valuable mineral deposits (appellants cited an appraisal of their deposits at more than $80 million), was not unreasonable, and may be employed by Congress to require claimholders to evaluate whether the claims are sufficiently valuable to warrant their retention.
 
 Id.
 
 The trial court concluded therefore that abandonment of appellants’ claims resulting from nonpayment of the statutory fee did not work a taking.
 

 The trial court accepted appellants’ assertion that due to their limited personal income, shown to be in the neighborhood of $35,000 annually, they could not themselves pay the total fees due, but found that this did not render the fee unreasonable. The court noted that appellants could have borrowed on the value of the claims, abandoned or sold less promising claims, or obtained third party funding for the fees.
 
 Id.
 

 Appellants appealed to this court. We have jurisdiction over the appeal under 28 U.S.C. § 1295(a)(3).
 

 DISCUSSION
 

 The trial court correctly found that the principles enunciated in
 
 Texaco
 
 and
 
 Locke
 
 govern this case, and properly applied them to find no taking in these circumstances. In
 
 Texaco,
 
 the State of Indiana had enacted legislation providing that mineral interests that were unused for 20 years would be extinguished automatically and revert to the surface land owner, unless the mineral interest owner filed a statement of claim with the county recorder of deeds within 2 years of the statute’s passage. The statute did not require any specific notice to the mineral owners before a statutory extinguishment of their interests.
 
 [6]
 

 Owners of severed mineral interests alleged,
 
 inter alia,
 
 that the statute deprived them of property without due process and effected a taking without just compensation.
 
 Id.
 
 at 522-23, 102 S.Ct. at 788-89. The Supreme Court upheld the constitutionality of the statute and found no taking. The Court first found that the state had the power to extinguish mineral interests created by it if the owners did not meet the conditions outlined in the state statute. ‘We have no doubt that, just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest.” 454 U.S. at 526, 102 S.Ct. at 790. The Court reasoned that communities historically had the power to permit the reversion of abandoned property interests, noting that the Court consistently had upheld recording and limitations statutes which resulted in such reversions.
 
 Id.
 
 at 526-29,102 S.Ct. at 790-92.
 

 
 *1553
 
 The Court then found that the state had not acted arbitrarily — the statute only considered mineral interests abandoned if no production had been performed, no rent or royalties had been collected, and no taxes had been paid, for 20 years,
 
 and
 
 the owner did not record a statement of claim within 2 years after the statute’s passage.
 
 Id.
 
 at 529, 102 S.Ct. at 792. The Court further found that the statutory conditions furthered the legitimate state goals of identifying and encouraging development of mineral interests, and collecting property taxes.
 
 Id.
 
 at 529-30, 102 S.Ct. at 792-93 (“The State surely has the power to condition the ownership of property on compliance with conditions that impose such a slight burden on the owner while providing such clear benefits to the State.”).
 

 The Court found that extinguishment of the mineral interests did not effect a taking because the Fifth Amendment did not require the government to compensate property owners who failed to preserve their property interests by “tak[ing] reasonable actions imposed by law.”
 
 Id.
 
 at 530,102 S.Ct. at 792 (“It is the owner’s failure to make any use of the property — and not the action of the State — that causes the lapse of the property right; there is no “taking” that requires compensation.”).
 

 In
 
 Locke,
 
 the Supreme Court applied the principles of
 
 Texaco
 
 to uphold the constitutionality of section 314(e) of the FLPMA, which provided that any unpatented mining claim for which annual filing requirements were not met would be conclusively deemed abandoned. The Lockes had made the required filings one day late, and the Government had deemed their claims forfeited. The Lockes argued,
 
 inter alia,
 
 that such forfeiture constituted an uncompensated taking in violation of the Fifth Amendment.
 

 The Court disagreed. The Court observed that Congress’ power to condition the retention of unpatented mining claims, a “unique form of property,”
 
 Locke,
 
 471 U.S. at 104, 105 S.Ct. at 1798 (quoting
 
 Best v. Humboldt Placer Mining Co.,
 
 371 U.S. 334, 335, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963)), was especially broad, for two reasons. First, the claimholders take their claims with the knowledge that the Government, as owner of the underlying fee title, maintains broad regulatory powers over the use of the public lands on which unpatented mining claims are located. Second, unpatented mining claims consist of “the right to a flow of income from production of the claim,” and thus are “held subject to the Government’s substantial power to regulate for the public good the conditions under which business is carried out____”
 
 Id.
 
 at 105, 105 S.Ct. at 1798. Therefore, the Court concluded, Congress may condition initial receipt of unpatented mining claims, and also may apply conditions to vested claims (such as appellants’ claims) when retroactive application is a rational means of achieving a legitimate legislative purpose.
 
 Id.
 

 In
 
 Locke,
 
 the Court found that requiring existing claim holders to make annual filings served Congress’ legitimate goal of ridding federal lands of stale claims and compiling updated information on the status of outstanding claims.
 
 Id.
 
 The Court stated:
 

 Even with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties. As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties.
 

 Id.
 
 at 104, 105 S.Ct. at 1797 (citations omitted). The Court found that the filing requirements imposed “the most minimal of burdens” on claimholders and were a reasonable restriction on claim retention.
 
 Id.
 
 at 107, 105 S.Ct. at 1799. The Court concluded that application of the filing requirements to vested claims did not effect a taking under the Fifth Amendment. “Regulation of property rights does not ‘take’ private property when an individual’s reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed.”
 
 Id.
 
 at 107,105 S.Ct. at 1799.
 

 Appellants argue that neither
 
 Texaco
 
 nor
 
 Locke
 
 controls this case because those cases
 
 *1554
 
 both involved “neglect” by the claimholders in not fulfilling statutory requirements for retention of their claims. In this case, as the Court of Federal Claims acknowledged, appellants did not neglect to pay the claim maintenance fees; rather, they consciously did not pay the fees, because they allegedly could not afford to do so. Thus they pose the question as one of a straightforward taking of private property — the mining claims— over the objection of the owners.
 

 The parties correctly treat this case as a regulatory taking claim. It is the failure by appellants to comply with the otherwise valid regulatory requirements of the law that causes the forfeiture, and the vesting in the United States, the holder of the underlying fee estate, of their previously-owned interests including the right to possession of the surface. Even the Government’s physical occupation of property as an incident to enforcement of the law does not ordinarily convert a regulatory taking case into one of. physical occupation.
 
 See California Housing Securities, Inc. v. United States,
 
 959 F.2d 955 (Fed.Cir.1992).
 

 Appellants’ regulatory takings approach- is consistent, moreover, with the Supreme Court’s analysis, particularly in
 
 Locke,
 
 which invoked familiar regulatory takings concepts such as “reasonable investment-backed expectations” and the reasonableness of the measure causing the deprivation.
 
 Locke,
 
 471 U.S. at 107, 105 S.Ct. at 1799. Although unpatented mining claims are “fully recognized possessory interests,”
 
 id.,
 
 they partake more of the character of use rights. Title to the land remains with the United States, and the unpatented mining claim holder has the right to use the Government’s fee simple estate for mining purposes. The Government created such rights expressly to promote that particular use of its property, i.e., development and extraction of the mineral deposits.
 

 Recent cases have demonstrated the need to tailor the test for regulatory takings to the specific context of the case.
 
 Compare, e.g., Penn Central Transp. Co. v. City of New York,
 
 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), a case involving the imposition of additional restrictions on existing land uses, in which the Court described three important factors, “the economic impact of the regulation on the claimant ..., the extent to which the regulation has interfered with distinct investment-backed expectations ..., [and] the character of the governmental action,”
 
 with Dolan v. City of
 
 Tigard,-U.S.-, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), a case involving subdivision exactions, in which the test was whether the exaction had a “nexus” to the identified harm caused by proposed development and whether the exaction was “roughly proportional” to that harm;
 
 and Lucas v. South Carolina Coastal Council,
 
 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), a case involving a regulatory imposition that denied any economic use of the land, and in which the test included the question of whether the State’s common law of nuisance principles would have authorized the imposition.
 

 In this case, there is little question that the regulatory imposition, including the annual $100 fee, serves the legitimate governmental purpose of ridding federal lands of stale mining claims and providing for centralized collection by federal land managers of comprehensive and up-to-date information on the status and worth of these claims.
 
 See Locke,
 
 471 U.S. at 105-06,105 S.Ct. at 1798-99. In this situation, as noted above, “[regulation of property rights does not ‘take’ private property when an individual’s reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed.”
 
 Id.
 
 at 107, 105 S.Ct. at 1799. The question, then, is whether the claim maintenance fee is a reasonable condition on the retention of unpatented mining claims.
 

 Although appellants emphasize that, unlike in
 
 Locke
 
 and
 
 Texaco,
 
 their noncompliance did not result from neglect, the gravamen of
 
 Locke
 
 and
 
 Texaco
 
 is that no taking occurs through automatic forfeiture of unpatented mining claims when the claim holder fails to comply, through neglect or otherwise, with a reasonable condition on the retention
 
 *1555
 
 of her claims, which condition is imposed to serve a legitimate governmental purpose.
 

 In this case, the trial court found that the claim maintenance fee was reasonable essentially because (1) it differed only in nature, not in value, from the prior assessment work requirement; and (2) compared with valuable mineral claims, the fee amount was not disproportionate and was in fact “inherently reasonable.” 32 Fed. Cl. at 255. Although appellants “accept the untrammeled right of Congress to impose a requirement of payment of a claim rental fee, in cash, as a condition to continued ownership of unpatented mining claims,” they disagree that the fee is reasonable. They argue that the $100 per claim fee for $100 worth of assessment work was “radically different in kind and degree” from the prior assessment work requirement, primarily because after the fee was imposed, appellants were no longer able to maintain their claims without outside assistance. Appellants contend that takings claims are decided on a case-by-case, intensely factual basis, and therefore “[t]he determination [as to whether the fee is reasonable] cannot be made by comparison of the claim rental fee to the value of the claims; it must be made by comparison of the claim rental fee to the holder of the claim’s ability to pay.”
 

 Appellants cite no authority, and we have found none, to support their subjective approach to measuring the reasonableness of a condition imposed by Congress on the retention of unpatented mining claims. Certainly no such standard emerges from
 
 Texaco
 
 or
 
 Locke.
 
 In
 
 Locke,
 
 for example, the Court stated that regulatory burdens imposed on mining claimholders are reasonable if they are “not so wholly disproportionate to the burdens other individuals face in a highly regulated society.” 471 U.S. at 107 n. 15,105 S.Ct. at 1799 n. 15. Regulatory takings law generally measures the “reasonableness” of a burden by assessing the impact of the regulatory imposition against the value of the property remaining.
 
 See, e.g., Keystone Bituminous Coal Ass’n v. DeBenedictis,
 
 480 U.S. 470, 497-506, 107 S.Ct. 1232, 1248-53, 94 L.Ed.2d 472 (1987). The trial court did essentially that in this case, by evaluating the $100 yearly fee against the appraised value of appellants’ mineral claims.
 

 Appellants’ subjective standard is unworkable as well as unprecedented. It would be difficult to argue that all persons who had the money to pay the fees at some time during the 1993 assessment year, or even earlier, but then spent it on a car or a child’s college tuition or lost it gambling, and therefore could not pay the fee at the appointed hour, suffered a taking upon forfeiture of their claims. Otherwise, claimholders could readily escape the fee requirement. Appellants’ test therefore would require the trial court to sort out meritorious from meritless takings claims by inquiring as to the nature of each claimant’s financial circumstances and why that claimant could not afford the fee. Nothing in takings law justifies imposing such a standard.
 

 Appellants’ reliance on
 
 Whitney Benefits, Inc. v. United States,
 
 926 F.2d 1169 (Fed.Cir. 1991), is misplaced. In
 
 Whitney,
 
 the property owner owned coal mining rights on property in an alluvial valley floor. The Surface Mining Control and Reclamation Act of 1977 prohibited Whitney and other owners of coal reserves in alluvial property from mining the reserves. This court held that Whitney had suffered a taking because the legislation and implementing regulations had denied Whitney all economically viable use of its coal rights.
 

 As the trial court found,
 
 Whitney
 
 differs from this case in a critical respect — there, the coal owner was absolutely precluded from mining. The effect was to deny Whitney all use of the property. In this case, appellants could have retained their use rights through the payment of a reasonable fee. Again, the fact that appellants could not have paid the fee without outside financing or some other means beyond their present personal cash savings and income, is not disposi-tive. The issue is whether the fee is objectively reasonable, as we have found it to be.
 

 Contrary to appellants’ assertions, the Court of Federal Claims did not base its conclusion that the fee was reasonable on unsupported fact findings concerning whether appellants could have taken various steps
 
 *1556
 
 to comply with the fee requirement, such as borrowing against the appraised value of their claims, entering into partnership with an investor who could provide sufficient funds, or abandoning or selling some claims. The trial court’s conclusion was reached by comparing the fee amount to both the value of assessment work previously required and the appraised value of the mineral claims. In commenting on ways in which appellants might finance payment of the fees beyond using their own resources, the Court of Federal Claims merely recognized that the market is likely to recognize and appreciate valuable mining rights and not be deterred in this respect by a $100 per claim annual fee.
 

 It is important to remember the type of property at issue here. Congress created unpatented mining claims expressly to encourage development and extraction of minerals, i.e., to exploit valuable mineral deposits. It is entirely reasonable for Congress to require a $100 per claim fee in order to assess whether the claim holders believe that the value of the minerals in their claims is sufficiently great to warrant such a payment; and whether claim holders have the resources and desire to develop these claims. If the claims are not valued by the claim holders sufficiently to warrant a $100 fee payment, then the claim holders’ decision not to pay the fee eliminates an unnecessary encumbrance on public lands and frees the land for a more valued use. If the claim holder cannot pay a $100 per claim fee, it is unlikely that she would be able solely through her own labor to develop the deposits, thereby frustrating the fundamental purpose in creating rights to unpatented mining claims.
 

 Appellants assert that the fee is not designed to put claim holders to these choices, but instead to raise money for the general Treasury and to wipe out small claim holders. We are not persuaded, particularly in light of Congress’ exemption for holders of 10 or fewer claims,
 
 see
 
 30 U.S.C. § 28k, and the
 
 due minimis
 
 amount of the fee. We conclude, therefore, that the fee was imposed for a legitimate public purpose and that the fee is objectively reasonable.
 

 CONCLUSION
 

 Under the applicable standards appellants have not suffered an unconstitutional taking without just compensation. The decision of the Court of Federal Claims is
 

 AFFIRMED.
 

 [1]
 

 . "[N]or shall private property be taken for public use, without just compensation.” U.S. Const. amend. V.
 

 [2]
 

 .
 
 Kunkes
 
 v.
 
 United States,
 
 32 Fed. Cl. 249 (1994). There is some question as to precisely what disposition the Government sought, and what the court granted. The Government filed a cross-motion for summary judgment in which it moved the trial court “to grant summary judgment against the plaintiffs,” but then asserted that "Plaintiffs have failed to state a claim upon which relief can be granted and, therefore, their complaint must be dismissed.” The decision of the trial judge in this case was that "the defendant’s [Government] motion for summary judgment is granted;” but the judgment was for dismissal. A summary judgment motion under Rule 56 calls for judgment on the merits of the cause in favor of the moving party. Dismissal of the complaint rather than entry of judgment in favor of the defendant is proper when the defendant moves under Rule 12(b)(6) asserting that the complaint on its face fails to state a claim for which relief may be granted. Unlike a Rule 12(b)(6) motion, a summary judgment motion does not simply test the sufficiency of the complaint; it involves examination of material outside the complaint, and determines whether on the undisputed facts presented in that material, the movant is entitled to judgment as a matter of law.
 
 See
 
 Fed.R.Civ.P. 12(b), (c); Fed.R.Civ.P. 56. Accordingly, for purposes of the appeal we treat the matter not as a dismissal but as an entry of judgment in favor of the Government.
 

 [3]
 

 . Unless otherwise stated, all citations are to the 1994 edition of the United States Code.
 

 [4]
 

 . The current statutory purchase price for fee title to the land is $5.00 per acre. 30 U.S.C. § 29. Congress has made some effort recently to raise the price to fair market value.
 
 See
 
 David Rogers, "Miners Win Senate Victory on Land Claims,”
 
 Wall St.
 
 /., Aug. 9, 1995, at A10.
 

 [5]
 

 . Congress has extended the fee requirement through 1998. Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, Tide X, Subtide B, § 10101, 107 Stat. 312, 405 (codified at 30 U.S.C. § 28f(a) (1988 & Supp.1993)). Holders of 10 or fewer claims may continue to provide assessment work in lieu of the fee. 30 U.S.C. § 28f(d) (1988 & Supp.1993).
 

 [6]
 

 . The mineral interests at issue in
 
 Texaco
 
 were created from privately owned, rather than federally owned, land.
 
 See Texaco,
 
 454 U.S. at 521, 102 S.Ct. at 787-88.