# United States Court of Appeals for the Federal Circuit

_____

**REOFORCE, INC., THEODORE SIMONSON, RONALD STEHN,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2015-5084

_____

Appeal from the United States Court of Federal Claims in No. 1:11-cv-00884-SGB, Judge Susan G. Braden.

_____

Decided: March 17, 2017

_____

RICHARD MERRITT STEPHENS, Stephens & Klinge LLP, Bellevue, WA, argued for plaintiffs-appellants.

JEFFREY STEVEN BEELAERT, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOHN C. CRUDEN.

BRIAN T. HODGES, Pacific Legal Foundation, Bellevue, WA, for amici curiae Pacific Legal Foundation, American

Exploration & Mining Association, Industrial Minerals Association-North America.

———————

Before NEWMAN, CHEN, and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

In this takings case, we must decide whether the Government prevented appellants Reoforce, Inc., Theodore Simonson, and Ronald Stehn (collectively "Reoforce") from mining on a tract of land in California for over a decade, thus taking Reoforce's property rights in a manner compensable under the Fifth Amendment of the Constitution. Reoforce brought this takings claim in the Court of Federal Claims. After a trial, the Claims Court found that Reoforce did not have standing and that Reoforce had also failed to prove the merits of its claim. Contrary to the finding of the Claims Court, we conclude that Reoforce has standing to bring its claim. We agree, however, with the Claims Court's judgment that the Government's acts did not effect a compensable taking of Reoforce's property. We thus affirm.

BACKGROUND

I.

In 1872, Congress enacted the General Mining Law, which made "all valuable mineral deposits in lands belonging to the United States . . . free and open to exploration and purchase." 30 U.S.C. § 22. The law "made public lands available to people for the purpose of mining valuable mineral deposits" by "reward[ing] and encourag[ing] the discovery of minerals that are valuable in an economic sense." *United States v. Coleman*, 390 U.S. 599, 602 (1968).

Under the General Mining Law, a citizen who discovers valuable minerals on a public land may secure a mining claim. *See* 30 U.S.C. § 28. To do so, a citizen must

"locate" her claim, which includes marking the boundary of the claim, posting a discovery monument and notice, and maintaining adequate records of the location date and boundaries of the claim. *See id.* Location of a claim, alongside the "'[d]iscovery' of a mineral deposit, . . . gives an individual the right of exclusive possession of the land for mining purposes." *United States v. Locke*, 471 U.S. 84, 86 (1985) (quoting 30 U.S.C. § 26).

A locator secures mining rights only by discovering a valuable mineral, and Congress has made clear that "common varieties of sand, stone, gravel, pumice, pumicite, or cinders" are not valuable mineral deposits under the Mining Law. 30 U.S.C. § 611. Whether a mineral is valuable is determined by applying a "prudent-man test." *Coleman*, 390 U.S. at 602. Under this test, the mineral deposit "must be of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *Id.* (internal quotations omitted).

Ordinarily, the Bureau of Land Management ("BLM") makes a "common variety" determination when a claim locator proposes to develop a deposit of an otherwise common material that may have distinct and special value. 43 C.F.R. § 3809.101; *see also id.* § 3830.12(b) (location requirements for uncommon varieties). "[T]he Secretary of the Interior, as the head of the department, is charged with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated and the rights of the public preserved." *Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 337 (1963).

If BLM determines that the mineral is a common variety, the mining claimant may either voluntarily relinquish its claim or BLM may institute a contest proceeding against the claimant. 43 C.F.R. § 3809.101(c). A contest

proceeding is an administrative proceeding used to determine the legality or validity of mining claims. *Id.* at § 4.451-1.

Once established, a mining claimant receives "a 'patent,' that is, an official document issued by the United States attesting that fee title to the land is in the private owner." *Kunkes v. United States*, 78 F.3d 1549, 1551 (Fed. Cir. 1996). A patented mining claim is "a property right in the full sense." *Union Oil Co. v. Smith*, 249 U.S. 337, 349 (1919).

Until a patent issues, the mining claimant has an "unpatented" mining claim, a "unique form of property." *Best*, 371 U.S. at 335–36. An unpatented claim entitles a claim holder to "extract and sell minerals without paying royalties to the Government," even though "[t]itle to the underlying fee simple estate in the land remains in the United States." *Kunkes*, 78 F.3d at 1551. But these claims are conditional property interests in a highly regulated industry. *Id.* at 1553. This is because the Government has "plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them." *Best*, 371 U.S. at 336. Holders of unpatented mining claims "take their claims with the knowledge that the Government, as owner of the underlying fee title, maintains broad regulatory powers over the use of the public lands on which unpatented mining claims are located." *Kunkes*, 78 F.3d at 1553. But "[e]ven though title to the fee estate remains in the United States, these unpatented mining claims are themselves property protected by the Fifth Amendment against uncompensated takings." *Id.* at 1551.

## II.

In the early 1980s, Theodore Simonson began exploring southern California for pumicite deposits. *Reoforce, Inc. v. United States*, 118 Fed. Cl. 632, 641 (2014) (Claims

Court Op.); J.A. 487. Pumicite is similar in composition to pumice, a porous volcanic rock. The composition of both pumice and pumicite includes a high amount of volcanic glass. But unlike hardened pumice, pumicite is a finely divided dust or powder consisting of finely divided particles of volcanic glass. It was the glass content of pumicite that piqued Mr. Simonson's interest in the mineral. Because pumicite's glass has an amorphous structure—it forms in various shapes, including fine beads and shards—Mr. Simonson thought that pumicite had many potential commercial applications. J.A. 122–24.

Mr. Simonson found high quality pumicite deposits in Kern County, California. In 1983, he located twenty-one mining claims in his name. *Claims Court Op.*, 118 Fed. Cl. at 641. In 1984 and 1985, he located two more claims. *Id.* Although the claims were in his name, Mr. Simonson and his wife did business as Rheoforce or the Rheoforce Filler Company. J.A. 12. The company's name was later changed to Reoforce, Inc., and Mr. Simonson called the pumicite in his located mining claims "Rheolite," or "Reoforce pumicite." J.A. 487–88.

## A.

For the next two decades, Mr. Simonson investigated the material properties of Reoforce pumicite to find commercial applications. He commissioned chemical and physical analyses as well as scientific testing. For example, Mr. Simonson contacted a Professor of Plastics Engineering to determine whether Reoforce pumicite could be used as a filler and extender in paints and plastics. *Claims Court Op.*, 118 Fed. Cl. at 641. The professor believed that Reoforce pumicite showed promise. He prepared and presented a conference report concluding that:

> Reoforce pumicite offers some very attractive advantages, including: (1) use as a filler in polypropylene, as it led to comparable tensile properties

and flexural strength, improved flexural modulus, and improved hardness/scratch resistance and improved handling and processability; and (2) use as a filler in ABS, where it led to improved tensile strength, tensile modulus, flexural strength, flexural modulus, impact strength, and improved hardness/scratch resistance and improved handling and processability.

*Id.* at 642 (internal quotations omitted).

This report was not alone. In the first two decades after his discovery of Reoforce pumicite, Mr. Simonson received several technical studies indicating the promise of Reoforce pumicite in commercial applications. For example, in September 1987, Mr. Simonson received preliminary test results conducted by an international supplier of high-performance plastic compounds and resins, finding Reoforce pumicite to be "a high quality specialty silicate" useful as an additive in plastic films. Suntec Paint Inc. ("Suntec") also saw Reoforce pumicite as potentially useful. It had been searching "for a[] [paint] extender which would provide [them] with further savings of Ti02 without affecting the physical properties of [their] latex flat [paint] formulations." *Id.* at 645 (first alteration added). Suntech found paint made with Reoforce pumicite to be equal in performance to its standard formula and found it produced "a savings of 15 lbs. of Ti02 and a savings of 5 cents per gallon (with Rheolite 16M at .25/lb.)." *Id.* Suntec indicated that it was willing to purchase Reoforce pumicite, although it later withdrew its interest. *Id.* Similarly, PRA Laboratories performed tests that showed Reoforce pumicite could save 15% of Ti02 per gallon of flat-white latex base paint. *Id.* Another company, Lindsay Finishes Inc., advised Mr. Simonson that Reoforce pumicite could save paint manufacturers approximately 28 to 30 cents per pound by using less Ti02. *Id.*

Repeated lab reports and industry analyses confirmed that Reoforce pumicite could be useful in industrial paint and plastic manufacture. *Id.* at 646–48. During this time Reoforce received its first orders, including two for 5,000 pounds each of "Reoforce Pumicite." *Id.* at 651. On October 20, 1991, the Technical Service Manager for English Clay sent another letter to Placer Dome U.S. describing the Reoforce pumicite deposit as "unique," with market potential, because it had a very low level of crystalline silica and "will have an application in the paint and plastics markets . . . . probably be useful in caulks and sealants . . . . , [and] possibly be usable in inks, textiles, [and] fiberglass reinforced polyester (FRP) applications." *Id.* at 647 (alterations in original).

At the same time that Mr. Simonson received news that his Reoforce pumicite might find successful applications in the plastics industry, he also learned that some other fillers and extenders, such as crystalline silica, were potentially carcinogenic because of high levels of crystalline quartz and crystabolite. *Id.* at 641–42. Norwegian Talc sent a letter to Mr. Simonson stating that "[a]ll parties agree in principle that your amorphous silica is unique in its properties and geological composition, and represent[s] a unique opportunity in the ever-increasing need to replace crystalline silica in a variety of end applications." *Id.* at 647 (alterations in original). Mr. Simonson requested further testing to see if Reoforce pumicite contained those potentially dangerous molecules. The tests came back negative; Reoforce pumicite did not contain quartz or crystabolite. *Id.*

## B.

In 1987, Mr. Simonson submitted a Plan of Operations to BLM for Reoforce to mine approximately 100,000 tons per year from his claims. *Id.* at 642; J.A. 457. Regulations required claimants such as Mr. Simonson to submit a plan of operations to BLM "before beginning

operations greater than casual use." 43 C.F.R. § 3809.11(a). BLM further required clarification and testing from Mr. Simonson before it approved his Plan of Operations. *Claims Court Op.*, 118 Fed. Cl. at 643. After Reoforce complied, BLM conditionally approved its plan. The conditional approval included twenty stipulations, including that the "material, pumicite, approved for extraction under this [Plan of Operations] is suspected by [BLM] as not being subject to location under the General Mining Laws," and that a determination of that question would be made at an unspecified time. *Id.* at 633 (quoting J.A. 649) (first alteration added).

The conditional approval letter made clear that BLM had not yet determined whether Mr. Simonson had discovered valuable minerals locatable under the General Mining Law. "In addition, the BLM advised that if pumicite is not locatable under the General Mining Law, but was mined under an approved [Plan of Operations], Mr. Simonson would be required to pay a per-ton royalty rate to the BLM based on prevailing market conditions." *Id.* Nevertheless, Mr. Simonson could now proceed with his mining plans. In July 1987, BLM sent a letter to Mr. Simonson to clarify "some confusion, misconception, and anxiety," arising from the stipulations in the May 28, 1987 conditional approval and advise that, "[t]o put it simply, your mining plan of operation has been approved." *Id.* (alteration in original).

Despite BLM's reassurances in 1987, Mr. Simonson decided to postpone the start of mining operations. He testified that he planned to wait until BLM completed its common/uncommon variety determination. *Claims Court Op.*, 118 Fed. Cl. at 643. Even so, Mr. Simonson continued preparing to commercialize Reoforce pumicite. He hired a consultant to complete a business plan to help him generate investor interest in a $4 million financing plan. *Id.* at 644. The plan suggested that Reoforce pumicite could be used as a substitute for 5% to 10% of the Ti02

that was used, at the time, as a "hiding pigment [to increase opacity] . . . in paint, ink, rubber, paper and plastics." *Id.* Around the same time, Mr. Simonson discussed the possible sale of Reoforce to Placer Dome US, a large commercial mining company. *Id.* Mr. Simonson testified that he refused Placer Dome's offer to buy Reoforce's claims for $100,000. *Id.*

In 1989, Mr. Simonson received good news from BLM: the agency concluded that Reoforce pumicite was an uncommon mineral, locatable under federal law. J.A. 488. The agency conducted a geological field examination and produced a Mineral Report concluding that Reoforce pumicite was "an uncommon variety and that it[s] proposed use, and all of the potential uses . . . clearly fall within a category of uncommon uses." *Id.* But the report clarified that it made no determination as to whether Mr. Simonson's mining claims were valid because the agency had not yet studied economic data and other information to determine whether these conditions justified further expenditure to develop the mine. J.A. 489. In other words, the report only addressed whether Reoforce pumicite was a common variety mineral, but it did not establish that Mr. Simonson had a right to patent his claims. *Id.*

A few months later, BLM approved Reoforce's 1987 Plan of Operations. *Claims Court Op.*, 118 Fed. Cl. at 646. In 1992, Reoforce requested a modification of approval of its plan to increase the annual tonnage of material mined to two-hundred thousand tons. *Id.* at 648. BLM granted the request. J.A. 951. Nevertheless, between 1987 and 1995, Reoforce mined only about two-hundred tons of pumicite. J.A. 163–65. Of the two-hundred tons it mined, Reoforce sold only five. J.A. 163.

## C.

In late 1995, Mr. Simonson received a letter from BLM explaining that the lands encompassing Reoforce's

mining claims would be transferred to the State of California under the California Desert Protection Act to become part of Red Rock Canyon State Park. J.A. 998–99. The letter explained that some mining claimants "may have valid existing rights" that would survive the transfer. J.A. 998. The letter noted that "[t]hese rights are predicated on the discovery . . . of a valuable mineral deposit" within the claim. *Id.* The letter was addressed to all mining claimants and did not specify whether Mr. Simonson's mining claims would survive the land transfer. *Id.*

BLM attached to this letter a Memorandum of Understanding ("MOU") between BLM and the California Parks and Recreation. J.A. 1000–03. Its purpose was to provide for the "management and administration of the lands within the Red Rock Canyon State Park that are not conveyed to the State Parks . . . due to being encumbered by unpatented mining claims." J.A. 1000. Specifically, the MOU permitted some mining claimants to continue operating while suspending others, depending on the claimants' use of the mine before the MOU. Because the MOU affected unpatented mining claims, BLM explained that the ultimate fate of these claims depended on the outcome of a valid existing rights determination ("validity determination").

The MOU divided mining claims into three groups. The MOU did not, however, indicate which group captured Reoforce's claims, and the parties continue to dispute here on appeal whether Reoforce's claims fell in Group Two or Group Three. Group Two, titled "Claims and Sites with Existing [Plans of Operations] for Exploration activities," applied to "[e]xisting [Plans of Operations] issued pursuant to 43 CFR 3809 for exploration activities (not for producing mines)." J.A. 1001. The MOU directed Group Two claimants to "suspend[] [activities] until a [validity] determination can be completed by a certified mineral examiner." *Id.* While Group Two claimants were

to immediately suspend their activities, Group Three claimants could continue activities on an interim basis. *Id.* Group Three, titled "Claims and Sites with Existing [Plans of Operations] for Producing Mines," was "restricted to operating mines under existing [Plans of Operations], those diligently and continuously extracting and marketing ores and related commodities from their mining claims and sites." *Id.* Finally, the MOU explained that unpatented claims ultimately judged invalid would transfer to California State Parks. *Id.*

## D.

A few months after sending the MOU, BLM sent Mr. Simonson a letter concerning another, separate barrier to Reoforce's mining operations, California's Surface Mining and Reclamation Act ("SMARA"). J.A. 1005. BLM explained that SMARA applied to Reoforce's claims, so it must submit a reclamation plan to comply with the act. *Id.*

The next year, in 1996, Reoforce held its first shareholder meeting and elected a board of directors. J.A. 1012. The elected board did not include Mr. Simonson. *Id.* Thereafter, Mr. Simonson was "not allowed to represent the company in any way." J.A 1023. "Another shareholder, John Foggan, assumed that position, [and t]hereafter Reoforce began to use the name the Foggan Group." *Claims Court Op.*, 118 Fed. Cl. at 654 (internal quotation marks omitted).

The Foggan Group's meeting minutes reflected discussions to expand mining operations. The shareholders discussed plans "to extract approximately 200 more tons of product sometime in March or April [1996]," but tabled the plan "until existence of [a] first [customer] order." J.A. 1017. The Foggan Group also pursued a joint venture for commercial production and submitted a new Plan of Operations to BLM. J.A. 1021–22. Ultimately, orders did not materialize and the venture failed. J.A. 146.

Investors withdrew from the Foggan Group and the joint venture abandoned Reoforce. *Id.*

In 2002, Mr. Simonson reactivated the company and reassumed his role as its president. J.A. 147. He also sent BLM a letter stating that he intended to "begin mining" pumicite. J.A. 1047. The letter thanked BLM for its "patience over the years" and for "understanding the difficulty of a one-man project." *Id.*

In 2003, Mr. Simonson sent a letter to inform BLM that Reoforce had satisfied the requirements of SMARA, the same requirements that BLM had notified him of almost a decade earlier, and that he intended to start mining on his claims. *Claims Court Op.*, 118 Fed. Cl. at 657. Mr. Simonson explained that, "[i]n waiting for this approval, I have been hindered in the mining of this pumicite." *Id.* Now, having the SMARA approval, Mr. Simonson informed BLM that he intended to "commence [his] approved mining operation." J.A. 1091.

E.

In 2004, BLM initiated a validity determination to consider whether Mr. Simonson's claims were valid under the mining law. The investigation concluded in 2006 with a mineral report finding Reoforce's claims invalid.

BLM conducted its investigation in accordance with the Supreme Court's prudent-man and marketability tests to determine whether Reoforce pumicite was a valuable mineral. J.A. 1181–87. BLM explained that "[i]t is not enough to say that there *might* be a market for this deposit; one must be able to say that there *is* a market." J.A. 1192.

BLM found that Reoforce pumicite was not marketable. J.A. 1173. Even though BLM had concluded in 1989 that Reoforce pumicite was an uncommon variety mineral, BLM found that it was not a "valuable mineral deposit[]" under the 1872 mining law. J.A. 1181. It arrived at

this conclusion through contacts with potential customers, finding that "[a]ll but one indicated that they do not want or need the material marketed by Reoforce, Inc." J.A. 1115. The one potential buyer intended to buy Reoforce pumicite on an as-needed, per-truckload basis. *Id*. The mineral examiner thus concluded that there was no market for Reoforce pumicite:

> I have examined those markets where Mr. Simonson stated his material could be directed. These included fillers and extenders in paints and plastics; soft, light abrasives for polishing and metal cleaning; and other possible markets where pumicite historically and presently has been directed that would support the deposit as being an uncommon variety pumice subject to location. I cannot support that pumicite from the El Paso claims can displace aluminum oxide in blast cleaning operations because the properties such as density and hardness are so different. *Based on my inquiries to Mr. Simonson's market contacts for paints and fillers, examination of this market where pumicite would displace other industrial mineral(s), and the fact that the Cudahy operations mining the same material have failed to show sales in a market only allows me to conclude that a market has not existed for the subject pumice on the El Paso placer claims from 1995*, the date of segregation from the operation of the mining laws, to the date of this report.

J.A. 1116 (emphasis added). In light of this report, BLM concluded that Mr. Simonson had failed to prove that he had discovered a valuable mineral under the General Mining Law, and thus concluded that his mining claims were invalid.

F.

In February 2007, the Department of Interior initiated a contest proceeding within its Office of Hearings and Appeals. J.A. 109. Citing the 2006 mineral report, the Department sought a declaration that Reoforce's mining claims were invalid and that the United States owned the property, free of mining claims. *Id.* The Department's complaint alleged that no valuable mineral discovery had been made on the claims, that no minerals had been found or exposed on the claims, and that the minerals that had been found on those claims were of common variety under the Common Varieties Act of 1955. *Id.*

In May 2008, the Department of Interior settled the contest with Reoforce. *Id.* The parties submitted a settlement agreement to the Office of Hearings and Appeals, and an Administrative Law Judge accepted the settlement as "serv[ing] to resolve all of the issues on appeal in this docket." J.A. 1500. In the settlement agreement, the parties agreed that Reoforce would relinquish its rights in twenty of the twenty-three disputed claims. J.A. 1365. But as to three of the claims, Reoforce retained some rights.

On these three claims, the settlement agreement granted Reoforce rights to mine in accordance with its Plan of Operations, subject to conditions. J.A. 1365–66. If those conditions were not met, the settlement agreement specified that Reoforce would relinquish its mining rights. The conditions required Reoforce to begin mining within twenty-four months of the settlement agreement and to not cease mining operations for any continuous period of twelve months. J.A. 1366. Thus, subject to those conditions, Reoforce gained the right to mine. *Id.*

III.

In 2011, Reoforce filed the complaint in the Court of Federal Claims that is the origin of the instant appeal.

Reoforce sought just compensation for an alleged temporary taking from 1995 to 2008 of the three mining claims it retained in the Settlement Agreement.[1]  Reoforce alleged that it had been on the cusp of significant mining operations in 1995, but also acknowledged that it "was not engaged in 'diligent and continuous' mining."  J.A. 99. Reoforce contended that its mining activities therefore fell within Group Two of the MOU, the group pertaining to mines with existing Plans of Opertions for exploration activities and the group for which members were required to cease activities until the completion of a validity determination.  *Id.*  Reoforce thus alleged that BLM's 1995 MOU had forced it to cease activities until the settlement agreement and the close of the validity determination in 2008.  Reoforce asserted that this cessation was a temporary taking of its property rights compensable under the Fifth Amendment.

The Claims Court held a six-day bench trial and issued a memorandum and final order setting forth its conclusions of fact and law.

The Claims Court first considered whether Reoforce's claim was barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501. *Claims Court Op.*, 118 Fed. Cl. at 663.  The statute, the court noted, is jurisdictional and could not be equitably tolled.  *Id.*  But the court also noted that the statute did not begin to run in 1995 because a takings claim will not accrue until it ripens.  The court reasoned that Reoforce's takings claim was not ripe in 1995, and only ripened when BLM effectively determined the validity of Reoforce's mining claims in the May 12, 2008 settlement agreement.  The agreement, the court concluded, was a final agency action that fixed the parties'

---

[1]     Ronald Stehn, a Reoforce investor, was later added to this case as a Plaintiff.  J.A. 35.

potential liability and thus ripened Reoforce's claim. *Id.* Because Reoforce's claim only began accruing in 2008, the court concluded that Reoforce's 2011 claim was not barred by the six-year statute of limitations. *Id.* at 664.

The court next considered whether Reoforce had standing to bring its suit. The court concluded that Reoforce did not have standing because it failed to satisfy the "injury in fact" requirement. Reoforce could not prove it suffered a legally cognizable injury, the court concluded, because it had relinquished its property rights before filing suit. *Id.* at 665. The court found that Reoforce lost its title because Reoforce did not prove that it met the settlement agreement's conditions—conditions that, if not met, would revoke Reoforce's mining rights. *Id.*

Despite finding that Reoforce lacked standing, the court next considered the merits of Reoforce's takings claim. Specifically, the court asked whether Reoforce had established that the Government's acts effected a regulatory taking under the framework announced in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 136 (1978). *Claims Court Op.*, 118 Fed. Cl. at 666. The court held that Reoforce failed to establish its claim on three grounds.

First, the court held that Reoforce did not have a compensable property right in 1995, the time the alleged taking began, because its "property interest did not vest until the May 12, 2008 Settlement Agreement." *Id.* Because Reoforce had no property right at the time of the taking, the court concluded that Reoforce could not establish its taking claim. *Id.*

Second, the court held that, even if Reoforce had a property right at the time of the alleged taking, the MOU did not prohibit Reoforce from mining. *Id.* The court found that, as a factual matter, the MOU did not oblige Reoforce to stop mining. *Id.* The court arrived at this finding by reviewing, *inter alia,* Reoforce's continuing

efforts to mine the sites after 1995 and a letter from BLM sent just before the MOU issued stating that Reoforce could continue mining under the MOU. *Id.*

Third, the court held that, even assuming the MOU had prohibited Reoforce from mining, Reoforce did not establish that the MOU interfered with its reasonable investment-backed expectations under the *Penn Central* framework. *Id.* at 666–68. The court found that Reoforce was "[a]t best, . . . several years away from commercial-scale mining on August 7, 1995." *Id.* at 667. "As such," the court concluded, "[Reoforce] incurred no economic harm caused by the August 7, 1995 MOU or any other BLM action." *Id.* The court further explained that Reoforce did not uniquely bear the burden of the MOU and that BLM acted in good faith when imposing the regulation. *Id.* at 667–68. The court thus concluded that the Government had not interfered with Reoforce's reasonable investment-backed expectations.

For those reasons, the court held that Reoforce had not established that it suffered a compensable taking. *Id.* at 688. Reoforce moved for reconsideration and the Claims Court denied the motion.

Reoforce appealed. We have jurisdiction to review final decisions from the United States Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

Before we reach the merits of Reoforce's claim, we must first consider two threshold issues: whether Reoforce has an injury in fact sufficient to confer standing, and whether Reoforce's claims are barred by the statute of limitations.

I.

For a plaintiff to have standing under Article III of the Constitution, it must "allege[] (and ultimately prove[])

an 'injury in fact'—a harm . . . that is 'concrete' and 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (quoting *Whitmore v. Arkansas*, 495 U.S. 149 (1990)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Claims Court held that Reoforce failed to satisfy this injury-in-fact requirement and thus did not have standing. *Claims Court Op.*, 118 Fed. Cl. at 665. On appeal, both parties agree that Reoforce has satisfied its standing requirements in this case. Nevertheless, because standing is a jurisdictional prerequisite, we must independently determine whether Reoforce has satisfied its Article III standing requirements. *See Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1289 (Fed. Cir. 2007).

The Claims Court held that Reoforce had compromised its standing by voluntarily relinquishing its property rights before filing suit. *Claims Court Op.*, 118 Fed. Cl. at 665. The court found that Reoforce had lost its rights because it had presented no evidence that it met the settlement agreement's condition to begin mining within 24 months. *Id.* The court concluded that Reoforce's failure to meet these conditions was a voluntary relinquishment of its property rights. *Id.* Because this relinquishment occurred after the alleged taking but before Reoforce filed suit, the court found that Reoforce had no standing to bring the suit. *Id.* The court acknowledged that this theory of standing, one not suggested by either party, "may be viewed as harsh." *Id.* But the court nevertheless held that this after-the-taking relinquishment of rights foreclosed Reoforce's suit. *Id.*

We cannot square the Claims Court's holding with our precedent. "It is axiomatic that only persons with a valid property interest *at the time of the taking* are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (emphasis added); *see also Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir.

2003). While precedent requires that the property owner prove its ownership at the time of the alleged taking, we are aware of no case that requires the property owner to possess those same rights during litigation. We thus decline to adopt the Claims Court's rule that a property owner must not relinquish its property rights before filing suit.

We conclude that Reoforce has standing to bring its suit here. Reoforce has alleged facts sufficient to show that it suffered a concrete and particularized injury in fact, that the injury was caused by the challenged action, and that the injury is redressable by a favorable decision. *See Lujan*, 504 U.S. at 560–61. Although the Government argues that Reoforce did not possess a valid mining claim and thus a compensable property interest at the time of the taking, that dispute does not defeat standing. It is a dispute over the merits of the case. Standing is "a threshold inquiry that in no way depends on the merits of the case." *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 31 (1993) (per curiam) (quotation marks omitted). "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co.*, 523 U.S. at 89. Thus, as the Government acknowledges, its dispute of the validity of Reoforce's property right does not defeat Reoforce's standing to bring its claim.

## II.

The Government argues, however, that Reoforce's claims are barred by the statute of limitations set forth in 28 U.S.C. § 2501. The statute provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This statute of limitations is "sometimes referred to . . . as 'jurisdictional.'" *John R. Sand &*

*Gravel Co. v. United States*, 552 U.S. 130, 133 (2008). Such statutes of limitations may not be equitably tolled or waived. *Id.*

The Government contends that if, as Reoforce alleges, its taking accrued in 1995 when BLM issued the MOU, then Reoforce filed its 2011 suit ten years too late. Reoforce replies that its claim is not barred by the statute of limitations because its claim did not accrue until it ripened upon the settlement of BLM's validity determination in 2008, even though it alleges damages beginning with the 1995 MOU. It argues that because the statute of limitations does not accrue until a claim is ripe, its 2011 case was filed within the six-year limitations period. We agree.

"[T]he standard rule [is] that the limitations period commences when the plaintiff has 'a complete and present cause of action.'" *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Calif.*, 522 U.S. 192, 201 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98 (1941)). "Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Id.* A claim must ripen to be "complete and present" and begin accruing, even if a taking might have begun at an earlier date for the purposes of measuring compensation. *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985); *see also Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez*, 659 F.3d 42, 51 (1st Cir. 2011) (collecting cases "reasoning that because the constitutional injury is not complete until the claim becomes ripe, the statute of limitations cannot accrue before that point in time"); *Royal Manor, Ltd. v. United States*, 69 Fed. Cl. 58, 61 (2005) ("[A] regulatory takings claim will not accrue until the claim is ripe.").

We agree with Reoforce that its claim did not ripen until 2008. Even if the Government began interfering with Reoforce's property rights in 1995, the taking claim did not ripen until Reoforce knew which claims it could mine. As we have explained, "the general rule is that a claim that Government regulation has taken the economic viability of a property 'is not ripe until the Government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Stearns Co. v. United States*, 396 F.3d 1354, 1358 (Fed. Cir. 2005) (quoting *Williamson Cty.*, 473 U.S. at 186). Here, the administrative process to determine Reoforce's property rights did not conclude until the settlement ended BLM's validity determination in 2008. Reoforce needed this determination to demonstrate the existence of a legally cognizable property interest as a necessary element of a takings claim. *See Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012). Without that determination, the parties' dispute would be an "abstract disagreement[]" and not ripe for this court to resolve. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). To determine otherwise "could potentially deprive [property owners] of the ability to file a takings claim at all." *Ladd v. United States*, 630 F.3d 1015, 1024 (Fed. Cir. 2010). Thus, we conclude that the statute began to run for Reoforce's claims when they became ripe in 2008, so the statute of limitations does not bar Reoforce's 2011 suit.

## III.

We now reach the merits of Reoforce's claim. Reoforce appeals the Claims Court's judgment that Reoforce had not suffered a taking compensable under the Fifth Amendment.

A.

"Whether a compensable taking has occurred is a question of law based on factual underpinnings." *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1266 (Fed. Cir. 2009) (quoting *Maritrans Inc. v. United States*, 342 F.3d 1344, 1350–51 (Fed. Cir. 2003)). We review the Claims Court's legal conclusions de novo and its factual findings for clear error. *Id.* "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. In a takings analysis, a court must determine "whether the plaintiff possesses a valid interest in the property affected by the Governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights,'" and, if so, "whether the governmental action at issue constituted a taking of that 'stick.'" *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000). Reoforce alleges that the Government effected a temporary taking of its property through regulation, i.e. the MOU. Because we ultimately conclude that Reoforce did not establish that the Government took its property rights in a manner compensable under the Fifth Amendment, we do not reach the question of whether Reoforce possessed a valid property right.

B.

Reoforce argues that the Government interfered with its property right in a manner that constituted a taking of that right. We conclude that Reoforce's claim fails on two separate grounds. First, Reoforce fails to show that the court erred in determining that the MOU did not in fact prevent Reoforce from mining on its claims. Second,

Reoforce does not successfully challenge the court's determination that, even if the MOU prevented Reoforce from mining, Reoforce did not prove that this temporary prohibition on mining constituted a taking under *Penn Central*.

1.

We first turn to whether the Government's MOU with California deprived Reoforce of its property rights. The Claims Court held that it did not. *Claims Court Op.*, 118 Fed. Cl. at 666. Both parties agree that this is a factual finding that we review for clear error. Appellant Br. 33 (calling the court's finding "clearly erroneous"); Appellee Br. 46 (agreeing with clearly erroneous standard). To find clear error, our court must be "left with the definite and firm conviction that a mistake has been committed." *U.S. Gypsum*, 333 U.S. at 395. Here, we discern no error in the court's finding that the MOU did not oblige Reoforce to cease its mining activities. *Claims Court Op.*, 118 Fed. Cl. at 666.

As discussed above, BLM sent the MOU to every mining claimant in the Red Rocks area affected by the California Desert Protection Act. J.A. 1000. The MOU identified three categories of affected mines, but only two that matter for this case: Groups Two and Three. J.A. 1001. Group Two was for "[e]xisting [Plans of Operations] for exploration activities" while Group Three was for "operating mines under existing [Plans of Operations]." *Id.* The MOU required parties in Group Two to suspended their activities while those in Group Three could continue mining on an interim basis. *Id.*

The Claims Court found that "the evidence belies Plaintiffs' contention that Reoforce was prohibited from mining by the MOU as of August 7, 1995." *Claims Court Op.*, 118 Fed. Cl. at 666. The court found that "[t]here are several dispositive pieces of evidence substantiating that the August 7, 1995 MOU did not affect or suspend Plain-

tiffs' May 28, 1987 approved [Plan of Operations]." *Id.* And the Court explained that BLM informed Reoforce just before sending the MOU that "[f]or operations such as yours, *you will be allowed to continue in accordance with your approved mining* [Plan of Operations] while the validity exam process is completed for your claims." *Id.* (alteration in original) (quoting J.A. 993).

The court also found that Reoforce continued to attempt to mine the site even after receiving the MOU. *Id.* at 666. In 1998, the Foggan Group sought to file a new plan of operations. J.A. 1026. It did not move forward with that plan, however, because the Bureau informed it that mining could not begin until it completed a validity determination. J.A. 1044. The Foggan group needed this determination, BLM explained, because the Foggan Group had filed a *new* plan of operations. *See* J.A. 1026. Existing plans under Group Three could continue operations.

Meeting minutes of Reoforce's Board further suggest that it perceived its mining operations as allowable under the MOU. In 1995, a group of shareholders discussed plans "to extract approximately 200 more tons of product sometime in late March or April [1996]," but the plan was "[t]abled until existence of first [customer] order." J.A. 1017. And in later meeting minutes, there was no mention of a suspension of mining activities. J.A. 1015 (March 2, 1996 minutes); J.A. 1016 (April 2, 1996 minutes); J.A. 1018–19 (January 4, 1997 minutes); 1024 (January 29, 1998 minutes); J.A. 1049 (September 16, 2002 minutes). Instead, the meeting minutes reflected the Board's belief that BLM "is satisfied with the mining plan and has allowed mining to begin at any time." J.A. 1024.

This view is further supported by Reoforce's acts concerning its SMARA application. In 1995, BLM sent Reoforce a letter to remind it to comply with California's

Surface Mining and Reclamation Act. J.A. 1005. While this letter referred to the August 1995 MOU, it did not suggest that BLM had suspended Reoforce's mining operations. *Id.* Rather, the letter noted that Reoforce must fulfill SMARA requirements before it could mine. And Reoforce did not mine until it met its SMARA requirements. In fact, Mr. Simonson sent a letter to BLM stating that he intended to start mining his claims shortly after Reoforce met those requirements. J.A. 1047. In that letter, Mr. Simonson thanked the Bureau for its "patience over the years" and for "understanding the difficulty of a one-man project." J.A. 1047. And then, a few years later in 2003, Mr. Simonson requested a validity determination because he was "ready to commence [his] approved mining operation." J.A. 1091.

The court summed up the evidence this way: "[A]fter the August 7, 1995 MOU, [Reoforce] entered into a joint venture; obtained a diesel permit for operation; drilled exploratory holes on the claims; continued to market 'Reoforce pumicite'; and filed an application to comply with SMARA." *Claims Court Op.*, 118 Fed. Cl. at 666. The court thus held that "the evidence belies Plaintiffs' contention that Reoforce was prohibited from mining by the MOU as of August 7, 1995." *Id.*

Reoforce disagrees, asserting that it rightly believed that its mining activities fell into Group Two and that the Claims Court's conclusion to the contrary is clearly erroneous. Reoforce directs us to BLM's official 2006 Mineral Report regarding the Reoforce claims, which stated that "Reoforce's activity falls within Group Two." J.A. 1119. And it points to testimony from a local BLM official, Lin Gum, who stated that, "essentially [Reoforce] was treated as if [it] was in Category 2." J.A. 1361. Reoforce also presents a series of BLM emails indicating that its mine was in Group Two. One stated that "Mr. Simonson is well aware that we cannot and will not permit him to conduct any further work at these claims until the Validity Exam

is completed." J.A. 1406. Reoforce offers several of these emails, each showing that some of BLM's agents understood Reoforce's operations as falling in Group Two. Appellant Br. 35–36 (collecting emails). But, as the Government correctly points out, these letters all significantly post-date the MOU; they were each sent in either 2006 or 2014. Appellee Br. 48. Reoforce thus presents no evidence of contemporaneous communications by BLM concerning whether Reoforce was in Group Two or Three. So while Reoforce may present evidence that conflicts with the Claims Court's ultimate factual finding, this evidence does not leave us "with the definite and firm conviction that a mistake has been committed." *U.S. Gypsum*, 333 U.S. at 395. We thus discern no clear error in the court's finding that the MOU did not prevent Reoforce from mining on its claims.

Finally, Reoforce asserts that the court violated Rule 52(a) of the Rules of the Court of Federal Claims because it did not specifically address some of the evidence supporting Reoforce's claims. Rule 52(a) requires the court to "find the facts specially and state its conclusions of law separately." Ct. Fed. Cl. R. 52(a); *see also* Fed. R. Civ. P. 52. But "Rule 52(a) does not require elaborate, detailed findings on every factual issue raised." *Atl. Thermoplastics Co., v. Faytex Corp.*, 5 F.3d 1477, 1479 (Fed. Cir. 1993). Here, the Claims Court held a six-day trial with more than 700 documentary exhibits, and its decision devotes 25 pages to factual findings. *See* J.A. 8–33. While the Claims Court did not elaborate on every exhibit and testimonial statement, Rule 52 does not require as much—the court need not "articulate every imaginable permutation and combination." *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986). We thus conclude that the court's opinion satisfied Rule 52.

Because we leave undisturbed the Claims Court's finding that BLM's MOU did not prevent Reoforce from mining, Reoforce cannot establish that the Government

took its property. Of course, a Government action does not effect a taking if it does not, in fact, deprive the property owner of a "stick in the bundle of property rights." *See Karuk Tribe*, 209 F.3d at 1374. Because Reoforce failed to prove such a deprivation of its rights, its taking claim fails.

2.

We next turn to the Claims Court's determination that, even assuming the MOU interfered with Reoforce's property rights, Reoforce has not established that the Government's action constituted a compensable taking under *Penn Central*.

Governmental interference with property rights constitutes a taking if it "goes too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 412–15 (1922). The "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The Supreme Court has recognized that there is no "'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124 (citing *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962)). The common touchstone of regulatory takings precedent is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

Deprivation of a property right, even if temporary, may merit just compensation under the takings clause. "[O]nce a court finds that a police power regulation has effected a 'taking,' the government entity must pay just

compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 328 (2002) (quoting *San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 658 (1981)). This "reflect[s] the fact that 'temporary' takings which . . . deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *First English Evangelical Lutheran Church of Glendale v. Cty. of L.A.*, 482 U.S. 304, 318 (1987).

But temporary interference with a property right may not amount to a taking. The Supreme Court has explained that "a permanent deprivation of the owner's use of the entire area is a taking of 'the parcel as a whole,' whereas a temporary restriction that merely causes a diminution in value is not." *Tahoe-Sierra*, 535 U.S. at 332. "Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Id.* But "the answer to the abstract question whether a temporary moratorium effects a taking is neither 'yes, always' nor 'no, never'; the answer depends upon the particular circumstances of the case." *Id.* at 321. Those circumstances, the Court has explained, must be tested under the *Penn Central* framework. *Id.* at 342.[2]

---

[2]    Reoforce does not contend that the Government's acts constituted a categorical taking under *Lucas v. S.C. Coastal*, 505 U.S. 1003 (1992), so we limit our analysis to the regulatory taking framework announced in *Penn Central*.

*Penn Central* articulated three factors of particular significance in the regulatory-takings inquiry: (i) the "economic impact of the regulation on the claimant," (ii) the "extent to which the regulation has interfered with distinct investment-backed expectations," and (iii) "the character of the governmental action." 438 U.S. at 124; *see also Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1115 (Fed. Cir. 2015). But as the Supreme Court has repeatedly cautioned, the *Penn Central* inquiry "is characterized by an 'essentially ad hoc, factual inquir[y]' designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Tahoe-Sierra*, 535 U.S. at 322 (quoting *Penn Cent.*, 438 U.S. at 124, and *Palazzo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)).

a.

We agree with the Claims Court that the MOU had minimal economic impact on Reoforce. To determine the economic impact of the alleged taking, we must determine whether the Government's action "merely causes a diminution in value" on the theory that "[l]ogically, [Reoforce's property rights] cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Tahoe-Sierra*, 535 U.S. at 332.

The Claims Court found that, "[a]t best, Plaintiffs were several years away from commercial-scale mining on August 7, 1995." *Claims Court Op.*, 118 Fed. Cl. at 667. Reoforce does not dispute this finding. Reply Br. 28. Reoforce in fact admits that it was at least four to eight years from commercial production in 1995. *Id.* And before 1995, Reoforce had sold only five tons of pumicite to one company for testing. J.A. 970–71. We find that these facts provide sufficient evidentiary support for the Claims Court's conclusion that Reoforce "incurred no economic harm." *Claims Court Op.*, 118 Fed. Cl. at 667.

Reoforce responds that the court's conclusion is clearly erroneous because it incurred harm from the duration of the Government's action. It contends that Reoforce "missed the opportunity for selling pumicite" because of the Government's thirteen-year delay between issuing the MOU and finalizing its validity determination. Reoforce presented this argument through expert testimony to the Claims Court. J.A. 234–36, 1412. But the court found this evidence unconvincing. It determined that, to the contrary, even if there was a government-imposed moratorium, it had no economic impact on Reoforce. *Claims Court Op.*, 118 Fed. Cl. at 667. As explained above, the court's conclusion is supported by abundant evidence that Reoforce was unprepared to take advantage of such a market, even if it existed. *Id.* Moreover, the court further concluded that the market for pumicite was "highly speculative." *Id.* As the court noted, despite Reoforce sending its pumicite to many different testers and possible investors, very few parties reciprocated interest. *Id.* Moreover, prior to the MOU in 1995, Reoforce had only made two minor sales in the twelve years since first locating a pumicite claim. *Id.*

In light of these findings, the court did not clearly err in finding that the MOU did not impact Reoforce economically. We thus agree that the economic-impact prong weighs heavily against Reoforce. *See Tahoe-Sierra*, 535 U.S. at 332.

b.

We likewise agree with the Claims Court that Reoforce "failed to establish that the August 7, 1995 MOU interfered with reasonable 'investment-based expectations.'" *Claims Court Op.*, 118 Fed. Cl. at 667. We have articulated three considerations "'relevant to the determination of a party's reasonable expectations': (1) whether the plaintiff operated in a 'highly regulated industry;' (2) whether the plaintiff was aware of the problem that

spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase." *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc)).

We agree with the Claims Court that the first factor weighs against Reoforce, as even Reoforce admits it operates in a highly regulated industry. Reply Br. 26. But Reoforce contends this fact is not dispositive. We agree. A property owner does not automatically relinquish her Fifth Amendment rights by entering a highly regulated industry. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 990 (1984) (finding regulatory taking in an industry "regulated . . . for nearly 75 years"). Nevertheless, in the context-dependent *Penn Central* inquiry, this factor weighs against Reoforce.

The second and third factors also do not favor Reoforce. Here, the Government action, i.e., the MOU, actually existed at the time of Reoforce's purchase, so no question exists as to whether Reoforce "could have reasonably anticipated" its passage. *Appolo Fuels*, 381 F.3d at 1349 (internal quotation marks omitted). In January 1997, Simonson and Stehn transferred their interests in all mining claims to Reoforce. J.A. 108. Reoforce was thus aware of the alleged Government action, i.e., the MOU, before it acquired the mining claims. J.A. 109. Of course, "[a] blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." *Palazzolo*, 533 U.S. at 628. But while Reoforce's "knowledge of the regulation is not per se dispositive, . . . it is a factor that may be considered, depending on the circumstances." *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1366

(Fed. Cir. 2009). Here, the circumstances again weigh against Reoforce's claim that the taking unfairly burdened its reasonable investment-backed expectations.

c.

Finally, we consider the character of BLM's action. Here we must consider "the actual burden imposed on property rights, or how that burden is allocated." *Lingle*, 544 U.S. at 543; *Rose Acre Farms*, 559 F.3d at 1278. In considering this burden, "[w]e can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill." *Rose Acre Farms*, 559 F.3d at 1278. Instead, we must consider "the *magnitude or character of the burden* a particular regulation imposes upon private property rights" and its distribution among property owners. *Lingle*, 544 U.S. at 542; *Rose Acre Farms*, 559 F.3d at 1278. For example, in *Rose Acre Farms*, we found regulations that did not "single out" or "target[]" the plaintiff and "broadly applied" to similarly situated property owners did not impose a heavy burden on the plaintiffs. *Rose Acre Farms*, 559 F.3d at 1278. So too here.

As the Claims Court noted, there was no evidence that the MOU "target[ed]" Reoforce. *Claims Court Op.*, 118 Fed. Cl. at 668. While the MOU's restrictions were "issued on a less-than-nationwide basis," it nevertheless applied to all mining claimants within the proposed addition to Red Rock Canyon State Park. *Id.* Even so, Reoforce rightly responds that *Lingle* requires consideration of the magnitude or character of the burden. *Lingle,* 544 U.S. at 542. But even this consideration does not weigh heavily in Reoforce's favor. Even assuming that Reoforce bore the burden of ceasing its mining activities, that burden was minimal due to its inability to economically exploit Reoforce pumicite. *See supra* Discussion, Section III.B.2.a. Thus, we conclude that the character of the MOU does not heavily weigh for or against Reoforce.

d.

Finally, we must balance the *Penn Central* factors to "ascertain whether, in light of those factors, it is unfair to force the property owner to bear the cost of the regulatory action." *Rose Acre Farms*, 559 F.3d at 1282. As discussed above, the economic-impact and reasonable-investment-backed-expectations factors weigh heavily against Reoforce. The character of the Government's action does not, however, weigh so heavily against Reoforce's taking claim. Even so, the Supreme Court has explained that "the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540. After weighing the *Penn Central* factors, we hold that, even assuming the MOU prevented Reoforce from mining, Reoforce has not established that it suffered a compensable taking of its property rights.

CONCLUSION

For the foregoing reasons, we reverse the Claims Court's determination that it lacked jurisdiction to hear Reoforce's claims, but affirm its holding that Reoforce did not suffer a compensable taking under the Fifth Amendment.

**AFFIRMED-IN-PART, REVERSED-IN-PART**

COSTS

No costs.